**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 24-cr-10101-JEK |
| ) | |
| JOHN REARDON ) | |
| ) | |
| Defendant. ) | |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant John Reardon threatened and harassed two Massachusetts synagogues and the Israeli Consulate in Boston with horrific and antisemitic violence. His conduct caused real harm to the victims who heard his threats as well as those who suffered the indirect consequences of his words. In communications made to the synagogues and the Consulate, Reardon threatened to bomb Jewish places of worship, kill Jewish children, and stomp Jewish babies dead into the ground. Reardon also invoked Holocaust methods of genocide, stating, "Time to prepare the furnaces again. I hope that you people are wiped off the face of the earth" (PSR ¶ 23). Because of Reardon's hate crimes, some victims have never returned to their places of worship, and others fear for their safety every time they enter their place of employment.

After pleading guilty to these crimes, and while on supervised release, Reardon again threatened people with violence, demonstrating a frightening inability to control his behavior and showing that he still does not understand that threatening people with violence is wrong, against the law, and distressing and frightening for victims. The Court must impose a punishment sufficient to deter Reardon's behavior so that he, and any other individual who might consider engaging in such hateful and harmful conduct, truly learns that it is unacceptable in our society.

Consequently, the United States recommends that this Court sentence Reardon to 30 months of incarceration, a subsequent three years of supervised release, restitution, a fine within the guidelines range if the Court finds he is able to pay, and a mandatory special assessment of $300.

## BACKGROUND AND OFFENSE CONDUCT

### A. The Defendant's Convictions

In Count 1, the defendant was convicted of obstructing the free exercise of religious beliefs by threat of force for threating members and employees of a synagogue in Attleboro, Massachusetts (PSR ¶ 12) on January 25, 2024, because they are Jewish (PSR ¶¶ 12-13). The defendant left a voicemail in which he spouted antisemitic slurs and threats, among them threats to bomb places of worship, threats to "end Israel and all Jews," and the statement, "don't be surprised if there is pigs' blood on your steps tomorrow" (PSR ¶ 13). As a result of Reardon's voicemail, employees and members of the synagogue were afraid for their safety, the safety of other congregants, and the safety of the synagogue building and grounds. (PSR ¶ 14).

In Count 2, the defendant was convicted of transmitting in interstate commerce a threat to injure a person for calling a synagogue in Sharon, Massachusetts on the same date and within minutes of his call to the Attleboro synagogue. (PSR ¶ 17). Again, Reardon's words made clear that he chose to threaten the synagogue because of its Jewish members and employees. (PSR ¶ 21). Reardon threatened the genocide of all Jews, and stated, "I don't have a problem with someone taking your baby and stomping it dead in the ground." (PSR ¶ 18). He further expressed a desire to see Jews starve and "have no medical." (PSR ¶ 18).

Count 3 addresses the defendant's conduct between October 7, 2023, and January 29, 2024, when the defendant was convicted of engaging in a course of conduct to harass and

intimidate employees of the Israeli Consulate in Boston. (PSR ¶ 22-23). In committing this offense, the defendant called the Consulate 98 times, sometimes speaking to employees and sometimes leaving voicemails. (PSR ¶ 23). In the voicemails, the defendant made multiple expletive-laden and distressing antisemitic statements, again calling for genocide against Jews and stating he hoped "somebody wipes you the fuck off the planet." He also referenced the Holocaust, stating, "Time to prepare the furnaces again. I hope that you people are wiped off the face of the earth." And like in his voicemail for the Attleboro synagogue, Reardon again mentioned pig blood, stating, "Oh, tonight is Sabbath. It would be a great day to pour pork blood all around the synagogues." (PSR ¶ 23). The defendant's statements make clear that he intentionally selected the Consulate employees as the targets of his harassment because they were (or he perceived them to be) Jewish, Israeli, or both.

       The victims of Reardon's crimes were scared and distressed, and some felt unsafe attending worship services or going to work. As a result of Reardon's threats, attendance at worship services and classes at the Attleboro synagogue decreased, and some congregants were afraid to physically visit the synagogue. (PSR ¶ 16). Similarly, employees of the Consulate were afraid after receiving Reardon's harassing phone calls; some were not comfortable walking out of the building alone and others were not comfortable coming to the facility at all. (PSR ¶ 26). The victims' statements submitted to U.S. Probation make clear that Reardon's crimes are still causing employees and members of the Attleboro synagogue to feel fear and anxiety today – over 18 months later. Even today, some congregants still will not attend events at the synagogue because of Reardon's threats.

       In addition, as a result of Reardon's crimes, the synagogues and the Consulate felt the need to take increased security measures to try to prevent harm and violence from befalling their

members, visitors, and employees. For example, the Sharon synagogue took steps to increase security of the building (PSR ¶ 20), the Attleboro synagogue hired police details to watch over the facilities (PSR ¶ 16), and the Consulate contacted local police to assist in daily searches of the facility and to accompany some employees when they left the building. (PSR ¶ 26).

### B. Defendant's Relevant Conduct Prior to Committing the Instant Crimes

Prior to committing these federal crimes, the defendant had already had several encounters with law enforcement related to allegations that he was making threats. On February 17, 2011, the defendant was arrested for making a threat to commit a crime of harm. (PSR ¶ 75). On November 3, 2022, the defendant was arrested for malicious destruction of property and threat to commit a crime. (PSR ¶ 77). Both cases were ultimately dismissed, but the prior arrests are relevant, given that the defendant's federal arrest was not the first – or even the second – time that he was arrested for making threats.

During the same time that Reardon was engaging in a course of conduct to harass and intimidate Israeli Consulate employees, he was also repeatedly calling Temple Israel, a synagogue in Boston. Between October 10 and November 14, 2023, the defendant made 11 calls, 7 of which connected, to Temple Israel. (PSR ¶ 29). An employee of Temple Israel recalled that at least one of Reardon's calls was hostile, but the calls were not recorded. (PSR ¶ 29).

Finally, the evening before calling and threatening the two synagogues in January 2024, Reardon called a pig farm in Milbury, Massachusetts. (PSR ¶ 28). The owner of the pig farm did not specifically remember Reardon's call but said that individuals occasionally call him to ask for pig blood, the very thing that Reardon mentioned in both his call to the Attleboro synagogue (PSR ¶ 23) and in one of his calls to the Consulate. (PSR ¶ 23).

### C. Defendant's Relevant Conduct After Committing the Instant Crimes

After Reardon's federal arrest and detention hearing, Magistrate Judge Levenson released him on February 7, 2024, ordering him to abide by specific conditions. ECF No. 13. In particular, the defendant was ordered not to commit "any offense in violation of federal, state or local law." *Id.*, Condition #1. He was further ordered to "obey all directions and instructions of the supervising probation officer." *Id.*, Condition #7(a). The defendant then pleaded guilty on November 25, 2024. Following the plea, the Court found that exceptional reasons existed, declined to detain the defendant, and ordered him to continue to abide by the conditions previously imposed by the Magistrate Judge. ECF No. 42.

Then on February 5, 2025, and February 12, 2025, the defendant allegedly called RightSpace Self Storage in Upton, Massachusetts and, among other things, threatened one employee that he would "fuck him up" and threatened to blow up the storage facility. (PSR ¶ 73). After learning of the threatening call to the storage facility, Reardon's U.S. Probation Officer contacted Reardon on February 27, 2025, and instructed him not to contact RightSpace Self Storage. ECF No. 50 at p. 4; ECF No. 50-1 at Ex. A (p. 2 of report). Yet the very next day, Reardon disobeyed this order by calling an employee of the storage facility. *Id*.

### U.S. SENTENCING GUIDELINES CALCULATION

While the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") are advisory and not mandatory, *United States v. Booker,* 543 U.S. 220 (2005), the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that a court should ordinarily begin by calculating the applicable guideline range." *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007). U.S. Probation has calculated the applicable guideline range to be 46-57 months. PSR p. 29. The government agrees with that calculation.

5

**THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The government recommends a sentence of 30 months. The government recommends that the Court sentence Reardon to 36 months of supervised release to follow his incarceration. Finally, in addition to all the conditions recommended by the Probation Office (PSR at pp. 31-32) the government recommends that the Court also include the following conditions for supervised release:

1. Educational classes or community service directly related to the community harmed by the defendant's offense; and

2. A stay-away-no-contact order as to all Jewish houses of worship unless specifically authorized by U.S. Probation.

Section 3553(a) of Title 18 specifies the factors courts are to consider in imposing a sentence and instructs courts to "impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. 18 U.S.C. § 3553(a). Section 3553(a) then directs a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed" to serve the four overarching aims of sentencing. §§ 3553(a)(1), (2)(A)–(D); *see Gall v. United States,* 552 U.S. 38, 50, n. 6 (2007). The Court must also consider the pertinent guidelines and policies adopted by the Sentencing Commission. §§ 3553(a)(4), (5); *see Gall*, 552 U.S. at 50, n. 6.

The government's recommendation reflects a downward variance from the guidelines, based on the defendant's swift and consistent acceptance of responsibility, his agreement to plead to an Information, and his health problems. However, a sentence of 30 months of imprisonment is appropriate and necessary here because the defendant's offenses were serious, he poses a significant risk of reoffending, and he deserves meaningful punishment for continuing

to disrespect the law and other people. The Court should impose this sentence to deter others with the defendant's criminal inclinations from acting on those inclinations.

### A. The Nature and Circumstances of the Offense and Defendant's Characteristics (18 U.S.C. § 3553(a)(1))

#### 1. *Nature and Circumstances of the Offense*

There can be no question that Reardon engaged in egregious and vile crimes that traumatized the employees and members of the Attleboro and Sharon synagogues and the employees of the Israeli Consulate in Boston. He chose to harass and threaten these victims because they were Jewish. In his statements, Reardon used highly offensive and genocidal language in an attempt to instill fear in the victims because of their religion. He succeeded, causing disruptions to religious gatherings, anxious efforts to enhance physical security, and substantial emotional distress.[1] This case isn't about one impulsive bad decision. Rather, Reardon engaged in a sustained, months-long course of conduct aimed at harming Jews that spanned three congregations in three Massachusetts cities, as well as the Israeli Consulate. He even called a pig farm, possibly seeking pig's blood, the night before he called and threatened the two synagogues. Reardon's out-of-control efforts to make Jews feel scared and his persistent targeting of individuals and organizations because of their religious affiliation is abhorrent and deserving of punishment.

#### 2. *History and Characteristics of the Defendant*

The government acknowledges that Reardon exhibits a limited criminal history and has certain mitigating factors including health problems. Nonetheless, his threatening conduct prior

---

[1] *See* Victim Impact Statements submitted to U.S. Probation.

to being charged and after pleading guilty in this case demonstrates a need for carceral punishment, protection of the public, and rehabilitation.

Well before he committed the hate crimes for which he is now being sentenced, it was made clear to this defendant that threatening people is a crime. He was arrested for making threats two times before he started harassing and threatening the Consulate and the synagogues. This defendant knew what threats are and he knew how people respond to them, yet he engaged in this criminal conduct anyway.

Then, even after he was arrested, charged federally, and pleaded guilty to multiple hate crimes, Reardon again threatened violence against the employees and property of a storage facility. In doing so, he frightened the victims of his threats and violated his conditions of release in multiple ways.

Unfortunately, the defendant has shown, repeatedly, that he does not understand that making threats is harmful and illegal. The government asks this Court to impose a sentence of 30 months of incarceration in the hope that it will finally teach this defendant a lesson that he has not yet learned.

B. **The Need for Sentence Imposed (18 U.S.C. § 3553(a)(2))**

1. *To Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))*

Reardon's convictions are serious offenses that merit a sentence commensurate with the harm he caused. While the Court can reference the PSR for a comprehensive review of the magnitude and detestable nature of the statements Reardon made, it's very clear that his words were antisemitic and designed to cause fear and emotional distress.

Reardon made those threats and engaged in that harassment to provoke a reaction. He succeeded. Due to the abhorrent and hostile content of his messages, some of his victims live in

fear for their physical safety, these communities have frantically obtained increased security, and regular worship ceremonies have been disrupted. In a statement submitted to U.S. Probation, one victim stated that she still feels triggered and unsafe in the synagogue – 18 months after Reardon's crimes. Other victims discussed how Reardon's actions destroyed the feeling of safety and peace in the synagogue, a holy place where people are meant to go to worship and pray. Because of Reardon's conduct, some congregants will no longer attend events at the synagogue because they are afraid. Reardon's conduct also caused the victim organizations to spend considerable monies to increase security in order to protect their facilities, and those inside them, from Reardon's threats.

What these victims' statements demonstrate is that even though Reardon used words in his calls and voicemails, those words resulted in significant and long-lasting physical and emotional impacts. Visceral reactions to once- comforting occasions now strike fear into some victims, and a synagogue that was previously open to the public is now locked at all times and visitors must be screened before entering. This was all foreseeable, and in fact, the precise result that Reardon should have expected when he launched a seemingly unending barrage of threats towards these communities.

A sentence of less than 30 months would not sufficiently punish Reardon for the serious crimes that he committed against his victims, nor promote due respect for the law in this matter. The government's recommended sentence is also aligned with the Judicial Sentencing Information (JSIN) data. *See* PSR ¶ 129 (noting that the average length of imprisonment for similarly situated defendants was 30 months).

### 2. *General Deterrence (18 U.S.C. § 3553(a)(2)(B))*

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. *See, e.g., United States v. Jaques*, No. 24-3390, 2025 WL 561784, at *9 (6th Cir. Feb. 20, 2025) (upholding a defendant's sentence and noting that "the [district] court looked to the impact of Jaques's crime on both society and his victims," and "the court was concerned his actions would embolden copycat criminals so a sentence that would deter this activity was necessary").

A sentence of 30 months in this case is also necessary to deter the criminal conduct of others, that is, to deter those who might otherwise be inclined to direct antisemitic language and threats towards members of the Jewish community. In the phone and internet age, people can level serious threats of violence with the click of a button. Antisemitic incidents have skyrocketed in recent years: "In 2024, [Anti-Defamation League] ADL tabulated 9,354 antisemitic incidents across the United States. This represents a 5% increase from the 8,873 incidents recorded in 2023, a 344% increase over the past five years and an 893% increase over the past 10 years. It is the highest number on record since ADL began tracking antisemitic incidents 46 years ago." (Audit of antisemitic incidents 2024. (2025, April 22)). https://www.adl.org/resources/report/audit-antisemitic-incidents-2024). The criminal justice system cannot solve antisemitism or almost any other problem on its own, but neither can it shrug its shoulders helplessly. General deterrence through sentencing might be uncertain, but general encouragement through minimal punishment is predictable. Sentencing John Reardon to less than 30 months in this matter would undermine the seriousness of his offenses and could encourage, through leniency, similar acts.

### 3. Specific Deterrence (18 U.S.C. § 3553(a)(2)(C))

A 30-month sentence will serve to protect the public by specifically preventing Reardon from reoffending.

Being arrested, pleading guilty, having court-ordered conditions imposed on release, and receiving warnings from a probation officer were not adequate to stop Reardon's criminal behavior. None of these events dissuaded him from continuing to terrorize people in a storage facility with threatening statements. A sentence of incarceration from this Court is necessary to prevent and deter Reardon from engaging in this conduct in the future. *See United States v. Sansone,* 90 F.4th 1, 10–11 (1st Cir. 2024) (finding that the sentence was fairly imposed, based in part on the defendant's violation of bail conditions when he made threatening comments despite a no-contact instruction).

The defendant has not demonstrated that he does not pose a risk of re-offending; in fact, he has demonstrated exactly the opposite. Reardon has subjected multiple victims to threatening and antisemitic language repeatedly over the past two years, and his relentless conduct, including making nearly 100 calls to the Israeli Consulate and impulsively calling the storage facility during his conditional release, reveal an astounding lack of self-discipline and a compulsivity that must be addressed. Other efforts have not been successful in stopping Reardon's behavior. The Court must sentence him to a meaningful period of incarceration in order to specifically deter him from committing future crimes.

### C. **Restitution**

Pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A(c)(1)(A)(i), restitution in this case is mandatory, as the defendant committed a crime of violence. *See* 18 U.S.C. § 16 (defining a crime of violence as "an offense that has as an element

the use, attempted use, or threatened use of physical force against the person or property of another").

The government asks this Court to order restitution to Victims 1 and 2 in the amount of $630 each to reimburse these victims for lost income, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Both victims will have attended a total of three hearings, including the sentencing hearing. The government estimates that each victim lost $200 in income for each day that they attended hearings in this matter and $10 round trip in commuter rail fares. Therefore the government asks that the Court order Reardon to pay $630 in restitution to Victim 1 and $630 in restitution to Victim 2.

### D. Conditions of Supervised Release

As set forth above, the government recommends that the Court order all the standard conditions of supervised release pursuant to USSG §§ 5D1.3(c) and 5B1.3(c) as well as the conditions recommended by Probation in the PSR at pages 31-32. In addition, the government recommends the Court also order the following conditions:

> a. *Educational classes or community service directly related to the community harmed by the defendant's offense*

The defendant intentionally selected his victims because of their religion – specifically because they were Jewish or perceived to be Jewish. The Probation Office correctly notes that USSG § 3A1.1(a), the "hate crime enhancement," applies to all three convictions.

When a Court sentences a defendant under 18 U.S.C. § 249 (the Shepard-Byrd Hate Crimes Prevention Act), section 249(e) specifically notes that the Court "may order, as an explicit condition of supervised release, that the defendant undertake educational classes or community service directly related to the community harmed by the defendant's offense." While

12

Reardon was not convicted under this statute, he did commit crimes of hate, and therefore the government recommends that the Court impose a condition of supervised release requiring him to take educational classes related to (1) the Jewish community, and (2) anger management.

      *b. A stay-away-no-contact order as to all Jewish houses of worship.*

The probation office recommended, and the government agrees, that the Court include a condition of supervised release requiring the defendant to have no contact, direct or indirect, with the victim organizations, their members, or their employees. (PSR p. 32). The government respectfully asks that the Court also add a condition that the defendant also have no contact, direct or indirect, with any Jewish house of worship without prior authorization from U.S. Probation. This prohibition should include visiting in person, calling, or emailing any synagogue, temple, or other Jewish house of worship. This proposed condition addresses both the nature of the offenses and the history and characteristics of the defendant, in particular his repeated pattern of threatening Jewish houses of worship and the evidence that he is unable to control his impulses. It wasn't just one synagogue that Reardon randomly targeted for his threats. He located and called at least three different Jewish houses of worship in the Boston area in the few months leading up to his arrest, plus the Israeli Consulate. This condition would not deprive the defendant of significant liberty interest because there is no indication in the PSR that he is Jewish or that he has an interest in attending events or services at Jewish houses of worship. And should he be interested in doing so for an appropriate purpose, he could seek authorization from U.S. Probation.

## CONCLUSION

For the reasons set forth herein, the United States respectfully requests the Court impose a sentence of 30 months' imprisonment followed by a three-year term of supervised release, total

restitution of $1,260, a fine within the guidelines sentencing range if the Court finds the defendant able to pay, and a mandatory special assessment of $300.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

*/s/ Torey B. Cummings*
Torey B. Cummings
Assistant U.S. Attorney

Dated: August 8, 2025

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Torey B. Cummings*
Torey B. Cummings
Assistant United States Attorney

August 8, 2025